Baldwin. The next case on the calendar is Baldwin v. State University of New York. Good morning, Your Honors. Lindy Korn from the Law Office of Lindy Korn in Buffalo, New this matter. And, Your Honors, this is a matter of claim of retaliation. Dr. Baldwin, in March of 2011, students came to her from Dr. Roberts' class. In total, there were, the record shows there were seven complaints of students that were afraid to complain, but they came to Dr. Baldwin. Dr. Baldwin, and these complaints, I think, are, there's affidavits and testimony, but they were about inappropriate comments. One student was called STD Charlie. There were comments about physical parts of women, about comments about acts of sex. Yeah, so she reported that. She reported. She took it to somebody else as well, but she was let go because of insufficient scholarly product, and at least that's the statement by the school, so the university. So, my question is, didn't all of that, didn't this reasoning for discharging her that they've asserted, didn't this start well before the comments that Roberts made in class? Your Honor, that is in dispute. There are genuine issues, material issues, that are in dispute, and that is why this case should go to. Okay. She was criticized and told that she had to improve her scholarly production, right? Your Honor, I would not say she was criticized. I think that they're buying into the defense story. She was told she was renewed several times. Indeed, Dr. Roberts, in 2000, I believe it was 2009, said that she was well on her way. There was a major difference between renewing a non-tenured faculty member's contract and a grant of lifetime appointment, isn't there? There is, but if you look at the... Is there any evidence in the record of anyone ever at Buffalo getting tenure on a publication record similar to Dr. Baldwin's? I don't know the answer to that. I do know that she met... Isn't that piece of some significance? The memorandum of understanding was expected of her. She met, and that is a genuine issue of fact. They were supposed to be publications. She had one in print, one in press, and one was actually accepted in a journal that has to do with health and wellness and science during the course of the consideration. That's a publication record compiled over ten years. Seven on a tenure track and a couple more, something like that, and a couple more before she was on a tenure track. She was... The three areas we're talking now about, scholarship, she met what was required of her, and let me say that she brought in grants, not just the one grant that became an issue here, but other grants. That was also part of scholarship according to the procedure that Dr. Baldwin had to meet. We feel that a jury needs to look at the inferences of bias here and decide whether they buy the case, and there's good reason not to. And yes, her scholarship was sufficient, pursuing to the Brockport standards and also by the memorandum of understanding. She had a quarter of... There were a couple of pieces that were written, but her contribution in one situation was 25%, and that was in the journal Health Promotion Practices, which apparently is a solid journal. And that was, I don't know if it's been published, but that was at least represented in the papers as being on the way to being published. That was published, I believe, during the time of this matter, but... What else was there in a highly rated journal? I'd like to address the idea that a percentage... There's evidence that, first of all, there's no criteria of looking at what the percentage of collaboration is in a scholarly journal. There was the... If you look at... I understand that, but aren't we looking at the quantum of production on her part? That's one aspect. If you look at the... 25% in one article, apparently, that she admits to. I mean, she stated it in her curriculum vitae. So there's no dispute about that, right? I believe that the 25% is not necessarily, number one, a criteria as to what the percentage of scholarship was contributed must be. But second of all, I believe that there was the external reviewer who was never... Dr. Roberts made his decision to non-renew and determinate her before he considered the external reviewer's input. The external reviewers plus the school's personnel committee unanimously voted that she had teaching, she had scholarship, and she had service. That came after Roberts' decision, right? The school... Yes. Yes, Your Honor. That's the committee from the School of Natural and Social Sciences, the faculty committee? Yes, it is. And they were charged with evaluating whether she should be promoted, if I understand the record correctly, but not to make a recommendation about tenure. Is that accurate? I believe that they were... The promotion... I believe they had both before them, Your Honor. But the point is, nowhere... That raises an inference of bias. And I think what's really important is the fact that there's a school committee that's unanimous, that talks about these issues, and yet the bad actor... It's got to be unanimous against in order for the state to prevail here. No, Your Honor, but I think when the chair who is... We are saying there's inference of bias that a jury should decide when that chair is also the person that Dr. Baldwin complained about. There's an inference that's able to be made. Dean Severson had the committee report in front of him when he made his decision. Isn't that right? I believe that is correct, yes. He recommended that she should not receive tenure or be promoted. He did, and he did. And also, I think that there's another... He did, Your Honor. How did he retaliate? I believe that he was... How did he retaliate? He did not look into the complaints. When Dr. Baldwin told Dr. Roberts himself, and complained to Dr. Severson, the complaints of those students' fear of being in an inappropriate setting, those complaints of sexual inappropriate comments was never investigated. And that's how he retaliated. Your Honors, I'd also like to draw attention to the fact... Could you just address, maybe you were going on to address this, but Dean Severson's investigation into whether your client had exaggerated her participation in the grant. And as I look at the record, I think it's undisputed that he talked to Ms. Propus, he talked to your client, he looked at... He talked to other people that your client identified, and he looked at emails and other correspondence that your client gave him, and came to the conclusion that she had exaggerated her participation. And Your Honor, there was evidence put before him, and indeed, at a deposition, there was a tape played. And I would say to you that there's an inference of a bias that needs to go before a jury, because there was, number one, this grant was funded and approved in 2006, and these issues were raised when Dr. Roberts, in 2011, went back to talk to this Carol Propus, who was the teacher that Dr. Baldwin actually collaborated with. Indeed, if you look at the evidence, the whole reason the grant was given had to do with school indexing, which is Dr. Baldwin's expertise. This teacher in Holland would never have known anything about this, and the tape says, we did it, congratulations, we got the grant. There was evidence that was overlooked, that a jury needs to look at to decide whether indeed there was any over-exaggeration in this issue. And furthermore, there's also in 2011, they were coming back to speak to her. Why would that be strange? Isn't this when she's up for tenure? Right. Isn't that when you start to look at somebody's record in a serious way? Well, Carol Propus was a teacher who the grant had been issued in 2006. She hadn't spoken to, had nothing to do at the 2011 with Dr. Baldwin, and all of these issues had been raised in 2006. So there's testimony that she thought it was strange. But the point I wanted to raise, I see my time is up and I have not... You can complete your talk. Yes. The point is that there's also a discrepancy on whether my client complained, and yet she's told by the Vice President of Human Resources that she, they acknowledge her complaint in this December 6th email, and then they say to her, but you have to complain to this Office of Equity and Diversity. So there's even a question of whether or not there's an acknowledgement of a complaint, and then they say, well, we can't do anything because you didn't complain to this specific office. These are serious issues. Retaliation cost my client who did not perform in teaching, scholarship, and service. And I ask you to consider the record and let us go to a trial. May it please the Court. Just a few points, Your Honors. I think this boils down between my friend on the other side and I to a dispute about the role of the 2009 Memorandum of Understanding, which she accurately cites as the central standard as of the plaintiff's scholarship in this case. The MOU does not lay out a set of conditions, the fulfillment of which automatically entitle her to tenure vis-a-vis scholarship or anything else. It lays out a series of And if you look, I think Your Honors were emphasizing about Professor Roberts' well-reasoned letter in the record at page 260 to 261. It's also run down in our brief, the State's brief at pages 10 through 12. You can see a meticulous application of all the criteria in the MOU, not just the number of publications, but the type of journal, her author contribution, the substance of the article and the like. And there's simply not anything on the face of that letter that would give anyone the impression that this was anything other than an honest belief in the deficiency of her scholarship. So your point is that the MOU was necessary but not sufficient and that she didn't measure up to the MOU? Oh, no, no. I think I was not making myself clear. The MOU sets the standard in this case by which plaintiff scholarship should be considered. But the standard that the MOU sets is not a set of sufficient conditions. It simply lays out guidelines, holistic guidelines, by which plaintiff scholarship and other tenure materials were judged. Your position is if she falls below the MOU, then that provides a basis for terminating her, for not promoting her? Oh, absolutely, Your Honor, but I just want to make clear about the State's position on this. I'm not even sure it makes sense to talk about falling below the MOU. I'm not sure the MOU is something that can be fallen below or above. It lays out a set of guidelines that are holistically applied, in this case by Professor Roberts at his stage of the review, by Dean Severson at his stage of the review, and the like. What you're saying is the MOU, which is at Appendix 841, doesn't say you need one article or you need three articles or you need two and a half articles. It says that scholarship can be documented by a variety of means, presentations, grant proposals, textbooks, and so on. The best record of research accomplishment includes peer-reviewed products. In particular, publications in peer-reviewed journals will be expected. So it's just saying, in general, this is how you look at the scholarship. You evaluate all of these factors. It doesn't set some minimum sufficient or minimum necessary requirements in terms of quantity. That's exactly right, Your Honor. And Professor Roberts and the other individuals from the State looking at these factors applied them thoughtfully, we think correctly, but as far as a retaliation under Title IX case goes, the question is not whether they were right or wrong, in my opinion or the panel's opinion. The question is whether they were done free from bias. And the consideration, we think, establishes just that. Am I right that Professor Roberts is the only tenured faculty member in this department? At the time. Well, was at the time. That's true. That's right. And also the chair. And he's the one who then, by default, becomes the committee of tenured faculty in her department, even though he's the person that she complained about. That's true, because there's no, there's normally, as Your Honor indicates, a departmental committee drawn from tenured faculty who are not the chair, because there was no such faculty in this case. He ended up being the only voice from the department. But he made this point to Professor Baldwin in advance of the tenure consideration. There's an e-mail exchange back and forth. I apologize I don't have the record site handy right now. There's an e-mail exchange back and forth, and he tells Professor Baldwin this. He says that the departmental bylaws say exactly what Your Honor just said, and there's no record of any sort of objection on Professor Baldwin's part. Unless there are any further questions. There is temporal proximity between the concerns she relayed to him in that spring and the taking up of the tenure file in the fall, and your adversary relies on that, and says that also her concerns about what was happening in the classroom were communicated to the next step in the tenure process to Dean Severson. And she says there was no action on her complaints, and he was the second stage of her tenure process. He was the second stage of her tenure process. There's no record actually showing what he did or didn't do in terms of investigation on the complaints that plaintiff reported about the students. But what there is a record of in Dean Severson's letter itself is, again, a consideration of all these factors focusing on the issue of whether or the extent to which Professor Baldwin collaborated on the grant, whether her curriculum vitae was accurately represented or not. And his thoughtful conclusion along those lines, in fact, is another legitimate, non-discriminatory reason, a separate and independent one, supporting the college's determination. The college made this point in its motion for summary judgment in its memorandum. Their memorandum is in opposition. Plaintiffs said nothing about it. District Court obviously didn't rely on that particular reason. But in her opening brief and her only brief submitted in this case, there wasn't a word as far as I could see about Dean Severson's resolution of that issue. But in our view, that presents a separate and independent basis for affirmance. So that makes the case stronger from the state's point of view. Is there any evidence in the record of who is the de facto decision maker at Buffalo? I assume that the Board of Regents or somebody at that level officially approves the tenured appointment. But is it the provost who is the key decision maker here or the department or the dean? How does that work at this place? Is there any record on that? There is. It's at page, I believe, 216 of the record. There's a list of everyone who signed off on all of the actions that took place in Dr. Baldwin's tenured review.  But strictly speaking, the final action is by the president of the university. And does the faculty committee that reviews the file, are they charged just with the promotion question or are they also charged with making a recommendation about tenure? What does the record reflect about that? They're charged only with making the promotion evaluation. But it is true that as a practical matter, the criteria that they consider are similar if not identical to the tenure criteria, which is why we think it's sufficient that even this body, even this body that said that she was qualified for promotion and even after her third article came in, they even found her to, quote, have a relative lack of publications, which was the factor that in our view ended up being legitimately determinative. I don't understand this distinction between promotion and tenure. On the very page that you cite, A216, with the list of recommendations and the action of the president, there's no line for anyone to say grant tenure. The question is, does her term expire or is a promotion recommended or do not recommend promotion? And the faculty committee recommends promotion. Would that not entail tenure under the AAUP rules? If you're promoted to associate professor, you get a new contract, you're now there for more than the maximum number of years you can be employed in a non-tenured capacity, you're now tenured if that recommendation is followed. Well, that sort of operation of law argument is not one I'm familiar with. It hasn't been made on the other side. But as the University of Buffalo does it, there's two components to what is colloquially called tenure. There's promotion, which is a title change from assistant professor to associate, and there's a continuing appointment as opposed to a term-to-term renewal. So theoretically, it is the rare case, Your Honor, but theoretically one could be an associate professor at the University of Buffalo but still on a term-to-term appointment as opposed to a continuing appointment. But nobody on this entire page checks some box that's called give tenure or do not give tenure. The boxes are promotion recommended, do not recommend promotion. It's true, the faculty committee has a slightly different set of boxes. It just says promotion or no promotion, while there are continuing appointment, renewal of term, expiration of term boxes for the other folks. Exactly. Continuing appointment, I think, might be what Your Honor is thinking of as closest to what is colloquially in University of Buffalo parlance called tenure. They usually do go together, but there is no one recommending a grant of tenure here. How is tenure granted? So if nobody's saying tenure is granted in this sheet in 216, then is there another sheet that would have it? No, no, this is the sheet. This is the evaluation. That's right. So nobody gets tenure at Buffalo? Oh, no, nobody. This person, no, no. Your Honor, tenure is a... There's no formal way of granting it? No, there absolutely is. That's what continuing appointment means on the box. Oh, okay. So if you were asked to make a recommendation about whether an applicant should get a continuing appointment, that means you were being asked whether they should get... Continuing appointment means tenure. It means what we think of colloquially as tenure. That's not, I guess, a term that Buffalo State officially uses. They use these twin concepts of continuing appointment versus term appointment, and then title, assistant, associate, professor, et cetera. But what's thought of, what the parties have been discussing in this case as tenure is, in this case, the combination of continuing appointment plus the accompanying title change. And is that an inference that we make from A216, because continuing appointment or expiration of term is not a set of choices offered to the faculty committee, or is there some testimony by somebody in the record that the faculty committee is not concerned with questions of tenure? Well, as far as I understand, that's not disputed, and I believe if you look at the faculty... That's not disputed, that they are not? That strictly speaking, their purview is only the title change as opposed to whether to convert a term appointment to a continuing appointment. I believe that their letter itself, which is... I apologize, I don't have the site handy, but I believe the letter of the school-wide committee itself indicates that only promotion as opposed to tenure is being considered. But I don't want to leave your honors with the wrong impression. As a practical matter, they are considering much of the same criteria in making this formally different determination. And their recommendation is passed along to the dean and to the provost and to the president. That's right, and considered not as an official recommendation of tenure or no tenure, because of course that's not what it is, but considered for what it is, namely an evaluation of the factors that happen to be very similar, if not identical, to those required for the continuing appointment consideration. Unless there are further questions, thank you, your honors. Thank you both. We will take it under submission.